UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **EGBERT J. DACOSTA,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**BIRMINGHAM WATER WORKS &** )<br>**SEWER BOARD,** )<br>)<br>Defendant. )<br>) | CV 03-B-1570-S |

## MEMORANDUM OPINION

This case is currently before the court on the Birmingham Water Works & Sewer Board's ("the Board") Motion for Summary Judgment, (doc. 46).[1] Plaintiff Egbert J. DaCosta ("DaCosta") has sued the Board for discrimination in violation of Title VII, § 1981, § 1983, the Age Discrimination in Employment Act, and the Alabama Age Discrimination in Employment Act. (Doc. 1.) DaCosta opposes summary judgment only as to his claims for retaliation and race and national origin discrimination. (Doc. 59.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court concludes that defendant's motion for summary judgment is due to be granted.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* At 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

**STATEMENT OF FACTS**[2]

DaCosta, who is of Indian heritage, moved to the United States in December of 1984. (Doc. 64 at 4.) The Board hired DaCosta on March 24, 1997 as a Computer Operator A, which is a salary grade 9 position. (*Id.*) DaCosta was hired by Buzz Kelly, the Data Processing Manager, and Jesse Inman, the Assistant Analyst. (*Id.*; doc. 47, Ex. 1 at 14.) Initially, DaCosta's direct supervisor was Greg Singleton and his second-level supervisor was Buzz Kelly. (Doc. 64 at 4.)

DaCosta submitted a letter of complaint to the Board on November 18, 1999. (*Id.* at 7.) DaCosta sent the letter to Buzz Kelly, Les Lewis, a Human Resources employee, and Runae Gary, the EEOC Manager. (Doc. 47, Ex. 45.) In his letter, DaCosta complained of being frequently addressed as "immigrant" and "foreigner," and being told, "let me show you how it's done in this country." (*Id.*)

On December 3, 1999, DaCosta wrote Randall Chafin, Assistant General Manager, complaining of being called "coffee boy"[3] and asked if he were wearing "pink panties." (Doc. 47, Ex. 46.) DaCosta also complained that Inman had asked him, but not another employee (Janet Taylor, a white female), to stock paper. (*Id.*) DaCosta also stated that

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to DaCosta, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of DaCosta. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

[3]Although DaCosta's brief suggests that the phrase "coffee boy" was "presumably a reference to DaCosta's brown skin," nothing in the record indicates that the phrase had any racial connotation. (Doc. 59 at 11.)

Inman threw a newspaper on the floor of his work area. (*Id.*)

On December 27, 1999, DaCosta met with Buzz Kelly, Randy Chafin, Jesse Inman, and Greg Singleton. (Doc. 64 at 26.) Inman was required to apologize for calling DaCosta "coffee boy" and throwing a newspaper on the floor of DaCosta's work area. (Doc. 64 at 8-9.) According to DaCosta, after this meeting, the name-calling stopped, and his supervisors' behavior toward him "took a different, more surreptitious turn." (*Id.* at 9.) DaCosta alleges that his supervisors required him to perform tasks that other computer programmers were not required to perform. (*Id.*) For example, DaCosta claims that he was ordered to take out the garbage, move equipment to a warehouse, and perform maintenance on the burster (a machine used to sort bills). (*Id.* at 9-10.)

On May 14, 2001, Kelly screamed at DaCosta for a mistake made by Janet Taylor, a white employee who had made a significant error. (Doc. 64 at 11-12.) Kelly told DaCosta that he would be terminated if he made a similar mistake. (Doc. 64 at 12.) On June 4, 2001, when DaCosta asked Kelly how much longer he would be working the night shift, Kelly and Inman responded, "As long as it takes!" (*Id.*)

DaCosta alleges that Kelly, who was responsible for approving training opportunities, blocked him from obtaining any significant training that would qualify him for key promotions. (Doc. 60, Ex. 9, ¶26.) DaCosta alleges the following specific instances:[4]

---

[4] With the exception of the November 2001 instance, the only place in the record that these instances appear is DaCosta's 2001 and 2002 year summaries. (Doc. 47, Ex. 51.) These

4

> *February 6, 2001*: DaCosta e-mailed Kelly requesting permission to take a Beginning Linux Fundamentals class at New Horizons, and was refused.
>
> *February 23, 2001*: DaCosta e-mailed Helen Horton about a tuition request to take the Certified Internet Webmaster class at New Horizons.  On February 26, 2001, Horton informed DaCosta that he would have to take the Foundations / I-Net+ class and the Site Designer class before taking the Certified Internet Webmaster class.
>
> *November 2001*: After taking an A+ course, DaCosta requested approval from Kelly for certification test fees, and was refused.

(Doc. 60, Ex. 9 at 3; doc. 47, Ex. 51; doc. 60, Ex. 6.)

On June 19, 2001, DaCosta applied for the position of IT Support Technician.  (*Id.* at 12.)  The position was awarded to Rhonda Lewis because, according to the Board, she was a Microsoft Certified Professional, a requirement of the job, and had been working at the Help Desk, a similar position, for the past six months.  (*Id.* at 12-13; doc. 47, Ex. 69.)  When asked whether he was qualified for the IT Support Technician position based on the job description, DaCosta responded that he was not.  (Doc. 47, Ex. 1 at 234.)  Plaintiff claims that he had previously requested and been denied the Microsoft Certification class, but cannot recall the date or provide any evidence of his request for and denial of training.  (Doc. 64 at 12.)  According to plaintiff, the Help Desk position had been created for the purpose of grooming Lewis for the position of IT Support Technician.  (*Id.*)

---

summaries consist of DaCosta's own records of activity occurring on various dates in 2001 and 2002.  DaCosta does not explain when or how these summaries were created.  The court doubts that these summaries constitute competent evidence; however, it will assume for purposes of this motion that DaCosta would testify at trial as to the incidents he writes about in his "summaries."

Plaintiff filed charges of discrimination with the EEOC on April 9, 2002 and March 14, 2003.  (Doc. 47, Ex. 10, 14.)  On May 2 and 3, 2002, DaCosta met with Runae Gary of Human Resources, and reported the following incidents: 1) after James Byrd's lynching in 1998, Inman stated, "That's the worst case of suicide that I have ever seen"; 2) in 2000, Singleton and Inman referred to the master's degree of Joyce Dupree, an African-American, as a "maasa's degree," mimicking the stereotypical language of an uneducated African-American; 3) during DaCosta's 2000 evaluation, Singleton told DaCosta that he could shove his evaluation up his ass.  (Doc. 64 at 14-15.)  In July 2002 Kelly altered DaCosta's work schedule and DaCosta's overtime hours were reduced.  (Doc. 64 at 15.)

DaCosta filed his Complaint on June 27, 2003.  (Doc. 1.)  DaCosta has conceded that all of his claims are due to be dismissed except for his retaliation claim and his claim for discrimination on the basis of race and national origin.  (Doc. 59.)  The court's Order on March 10, 2004 limited plaintiff's Title VII claims to those arising within 180 days of plaintiff's second EEOC charge, filed on March 14, 2003.  (Doc. 14.)

## STATUTE OF LIMITATIONS

The parties briefed the issue of whether a two or four year period of limitations governs DaCosta's § 1981 claims.  Because DaCosta's claims arise under a post-1990 enactment, they are governed by a four year statute of limitations.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).

**DISCUSSION**

**A. RETALIATION**

To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to plaintiff's protected activities. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Id.*

DaCosta engaged in protected activity in 1999, and again in 2002 and 2003.[5] Because of the time between these instances of protected activity, the court will analyze the 1999 activity separately from the 2002 and 2003 activity.

*1999 Protected Activity*

DaCosta alleges two instances of protected activity in 1999. To establish that he engaged in statutorily protected expression, a plaintiff must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.

---

[5] Although DaCosta's brief addresses retaliation only with regard to his 1999 letters, counsel for the plaintiff briefly argued one retaliatory act in response to DaCosta's EEOC charges.

1997) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)). "A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960.

DaCosta engaged in statutorily protected activity when he made an internal complaint on November 18, 1999. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). DaCosta wrote to Buzz Kelly, the Data Processing Manager, Les Lewis, a Human Resources employee, and Runae Gary, the EEOC Manager. (Doc. 47, Ex. 45.) In his letter, DaCosta complained of being frequently addressed as "immigrant" and "foreigner," and being told, "let me show you how it's done in this country." (*Id.*) DaCosta stated that the harassment created an "intolerable work environment." (Doc. 60, Ex. 2.)

DaCosta contends that he again engaged in protected activity on December 3, 1999, when he wrote Randall Chafin, Assistant General Manager, complaining of being called "coffee boy" and asked if he were wearing "pink panties." (Doc. 47, Ex. 46.) DaCosta also stated that the harassment was "beginning to affect [his] attitude, performance and ability on the job."[6] (*Id.*)

---

[6]The court finds that only the November 18, 1999 letter constitutes protected activity. However, because the December 3, 1999 letter was so close in time to the November 18, 1999 letter, the court will assume that the December letter was also

*Adverse Employment Action*

DaCosta alleges that the adverse employment action took many forms, including giving him unfavorable job assignments, requiring him to bring a doctor's excuse, lowering his performance evaluations, yelling at him, and denying him training opportunities.  (Doc. 64.)  Even when the Board's alleged reprisals are considered in their totality, they do not rise to the level of an adverse employment action.

"Although we look to the 'totality of the alleged reprisals,' we consider only those that are truly 'adverse.'" *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 588-89 (11th Cir. 2000)).  "Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis using both a subjective and an objective standard." *Id.* at 1234.  "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).  "Title VII[ ] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the working place.'" *Id.* (quoting *Gupta*, 212 F.3d at 587).

DaCosta's evidence regarding unfavorable job assignments is insufficient to

---

protected expression.

9

constitute adverse employment action.  *See Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).  Being required to take out the garbage, move equipment, and work night shifts does not "impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way," or amount to a serious and material change in the terms, conditions, or privileges of his employment.  *See Davis*, 245 F.3d at 1232; *Gupta*, 212 F.3d at 587.  Furthermore, there is no evidence that such tasks were outside the scope of the duties of a Computer Operator A or that other Computer Operators were not required to perform the same tasks.

   DaCosta alleges that he suffered an adverse employment action in March of 2000 when Kelly told him that he needed to bring in an excuse from a doctor if he was sick.  (Doc. 47, Ex. 77.)  However, the Board's Employment Policy clearly provides for this requirement.  (Doc. 47, Ex. 25.)  The Employment Policy states:

> Failure to provide verification of illness will result in a loss of compensation for the days on which the absences occurred.  The Board reserves the right to authenticate any physician's statement presented as verification of illness. . . . If there is evidence of abuse of this policy, management may require a doctor's excuse even if it is the first 24 hours of sick leave.

(*Id.*)  DaCosta's evaluation for the period in question indicates that there was evidence of abuse of the Board's sick policy.  (Doc. 60, Ex. 4.)  He was tardy between seven and ten times and used between eighty-one and 112 sick hours.  (*Id.*)  There is no evidence that the Board applied its sick policy any differently to DaCosta than it did to any other employee.  *See Cotton*, 434 F.3d at 1234 ("When an employer applies its standard policies

10

in a nondiscriminatory manner, its action is not objectively adverse.")

DaCosta contends that the Board further retaliated against him by reducing his performance evaluation scores after his 1999 letters of complaint. "An evaluation that directly disentitles an employee to a raise of any significance is an adverse employment action under Title VII." *Gillis v. Georgia Dep't of Corrections*, 400 F.3d 883, 888 (11th Cir.2005). On the other hand, performance evaluations that do not "result in any material change in [the employee's] compensation, benefits, terms, or privileges of employment" do not constitute adverse employment actions. *Davis*, 245 F.3d at 1239. DaCosta's evaluations fall into the latter category. There is no evidence in the record that DaCosta's performance evaluations, which were never below standard, factored into any promotion decision.[7]

DaCosta's allegation that Kelly screamed at him for another employee's mistake does not constitute an adverse employment action. *See Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 243 (4th Cir.1997), *cert. denied*, 522 U.S. 1116 (1998) (yelling at the employee and telling others to ignore and spy on her does not constitute an adverse employment action); *Malladi v. Brown*, 987 F.Supp. 893 (M.D. Ala. 1997) (employer shouting at employee in front of other employees is not an adverse employment action); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1298 (3d Cir. 1997)

---

[7]He admits that he was not qualified for certain promotions because he did not have the training. (Doc. 47, Ex. 1 at 230-35.)

("unjust reprimands" did not constitute an adverse employment action). Kelly screaming at DaCosta did not affect DaCosta's "compensation, terms, conditions, or privileges of employment." *See Gupta*, 212 F.3d at 587.

DaCosta also alleges that the Board failed to train him. An employer's failure to train an employee rises to the level of an adverse employment action when it "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). In the present case, DaCosta alleges, but fails to offer evidence, that he was denied training that others received, and that the denial of training prevented him from obtaining a promotion. (Doc. 64 at 21.)

The only potential comparators mentioned in DaCosta's brief are Pete Davis and Rhonda Lewis. Neither Lewis nor Davis is a true comparator. While Lewis was promoted to IT Support Technician largely because she was a Microsoft Certified Professional, she did not obtain that training through the Board. (Doc. 46, Ex. 2.) Lewis, through her own initiative, took Microsoft Certification training while taking classes at Jefferson State Junior College in preparation for an undergraduate degree. (*Id.*) Therefore, DaCosta was not denied any training by the Board that Lewis received from the Board. While DaCosta vaguely suggests that Davis obtained a promotion because of superior training opportunities, he does not specify any training that he was denied, but

12

Davis was given, that led to Davis's promotion. (Doc. 64 at 21.) As for DaCosta's allegation that he was denied Linux and Certified Internet Webmaster training, he fails to connect that denial of training to any denied promotion or other effect on his compensation, terms, conditions, or privileges of employment.

DaCosta's allegations, even when considered in their totality, amount to the "ordinary tribulations of workplace." *See Gupta*, 212 F.3d at 587. Consequently, he fails to establish that he was the victim of an adverse employment action, and fails to create a prima facie case of retaliation. However, even if the Board's treatment of DaCosta did amount to an adverse employment action, DaCosta cannot show that it was causally related to his complaints.

*Causal Relationship*

To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 590. "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Id.* (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

DaCosta offers no evidence of a causal connection between his complaints and the alleged adverse employment actions. He contends that before his complaints "he was not consistently denied training opportunities," but that after his complaints "he was denied

13

the most important training opportunities." However, to the extent there was any change in the Board's responses to DaCosta's training requests, that change was too remote to establish a causal connection.

DaCosta identifies only three specific instances of the Board denying him training.[8] (Doc. 60, Ex. 9 at 3; doc. 47, Ex. 51; doc. 60, Ex. 6.) Those three instances occurred on February 6, 2001, February 26, 2001, and November 2001.[9] (*Id.*) Therefore, even the earliest instance occurred more than a year (fourteen months if the December letter of complaint is considered protected activity) after DaCosta's 1999 letters.

The Supreme Court and the Eleventh Circuit have held that as little as three months is by itself insufficient to show a causal connection. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Consequently, DaCosta's evidence fails to show a causal connection. However, even assuming DaCosta established a prima facie case, the Board has articulated a number of legitimate, non-discriminatory reasons for its actions.

*The Board's Articulated, Non-discriminatory Reasons*

The Board has articulated a number of non-discriminatory reasons for plaintiff's

---

[8]Although DaCosta also claims that he was denied Microsoft Certified Professional, he offers no evidence as to when the alleged denial of training occurred. (Doc. 64 at 23.)

[9]These three instances involved DaCosta's requests for Beginning Linux Fundamentals, Certified Internet Webmaster, and the test fees for A+. (Doc. 60, Ex. 9 at 3; doc. 47, Ex. 51; doc. 60, Ex. 6.)

14

claims regarding training opportunities. First, the Board notes that plaintiff has attended numerous classes. (Doc. 65 at 21.) The Board also offers one of plaintiff's evaluations, where he was advised that he was "in need of specific software training including Windows NT and other PC software." (Doc. 65 at 22.) This evidence contradicts plaintiff's contention that he, unlike other employees, was kept in the dark as to which classes would be needed for future promotions. The Board also notes that in its Data Processing Department, where plaintiff was employed, the direction of technology is unpredictable. (Id.) As a result, it is beneficial for employees to train in as many areas of technology as possible. (Id.) According to the Board, certain employees were simply more ambitious and aggressive in pursuing training opportunities. (Id. at 22-23.)

     The Board has also articulated a non-discriminatory reason for all of the other alleged adverse employment actions. According to the Board, occasionally moving equipment and trash is within the scope of the job responsibilities of a Computer Operator A, and other employees were also required to perform these tasks. (Doc. 65 at 28; doc. 47 at 3.) DaCosta was required to work the night shift for longer than three months only because Gene Brown, a new Computer Operator, was in training. (Doc. 65 at 28.) The Board does not place employees on the night shift until they are fully trained. (*Id.*) Once Brown was fully trained, he was placed on the night shift, and served an extended night shift rotation to compensate DaCosta for his own extended night shift rotation. The Board explains DaCosta's lower evaluation scores in the years following his complaint by

pointing to his absences and tardiness. (Doc. 60, Ex. 4; doc. 47, Ex. 56-59.) The Board's non-discriminatory reason for requiring DaCosta to bring a doctor's excuse for absences is that the Board was merely applying its Employment Policy. (Doc. 47, Ex. 25.) There is no evidence that the Board applied its Employment Policy any differently to DaCosta than to other employees.

*Pretext*

Even assuming DaCosta established a prima facie case, he fails to show that the Board's articulated, non-discriminatory reasons are a pretext for discrimination. To show pretext, a plaintiff must "'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). An employer's articulated reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Other than the evidence in support of his prima facie case, DaCosta's only evidence of pretext is the affidavit of Jonathan McPherson and the "name-calling of a racial and national-origin nature." (Doc. 64 at 25.) As for the name-calling, DaCosta admits that after his "complaints and the resulting meeting with Chafin, Kelly, Inman, and

Singleton, the name calling stopped." (Doc. 64 at 9.) McPherson's affidavit also fails to establish pretext. First, the affidavit recounts events that occurred in September and October of 2002, almost three years after DaCosta's protected activity. (Doc. 60, Ex. 7.) Second, McPherson's affidavit discusses a meeting about filling a position for a Help Desk position in 2002, and DaCosta does not allege or offer any evidence that he applied for that position. Therefore, even assuming that DaCosta established a prima facie case of discrimination, he fails to show that the Board's articulated, non-discriminatory reasons are a pretext for discrimination.

*2002 and 2003 Protected Activity*

DaCosta engaged in protected activity by filing a Charge of Discrimination with the EEOC on April 9, 2002[10] and again on March 14, 2003. (Doc. 47, Ex. 10-14.)

*Adverse Employment Action*

The only adverse employment action alleged in relation to DaCosta's EEOC charges is the reduction of DaCosta's overtime hours in July of 2002. "Discriminatory alterations of financial benefits may qualify as adverse employment actions." *See Bass v. Board of County Commr's*, 256 F.3d 1095, 1118 (11th Cir. 2001). Therefore, DaCosta creates an issue of fact that he was the victim of an adverse employment action.

*Causal Relationship*

DaCosta has offered no evidence that the Board treated him differently than any

---

[10]DaCosta amended his first charge with no substantive changes on April 23, 2002. (Doc. 47, Ex. 11.)

other employee. Therefore, he relies only on temporal proximity to show a causal relationship between his protected activity and the adverse employment action. DaCosta's overtime hours were reduced in July 2002, approximately four months after his second EEOC Charge, and five months after his first EEOC Charge. The Supreme Court and the Eleventh Circuit have held that as little as three months is by itself insufficient to show a causal connection. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Consequently, DaCosta fails to show a causal relationship between his protected activity and the adverse employment action, and therefore fails to establish a prima facie case.

## B. RACE AND NATIONAL ORIGIN DISCRIMINATION

Plaintiff characterizes his race and national origin discrimination claim as "a failure to train case with the attendant consequences of failure to promote." (Doc. 59 at 21-22.) In order to establish a prima facie case of race and national origin discrimination, plaintiff must show that 1) he was a member of protected group, 2) an adverse employment action took place, and 3) he and a similarly-situated non-protected person received dissimilar treatment.[11] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997);

---

[11]The Seventh Circuit has tailored the *McDonnell Douglas* requirements to apply to failure to train claims. To establish a prima facie case of discrimination for failure to train the plaintiff must show that (1) he is a member of a protected group; (2) that the employer provided training to its employees; (3) that he was eligible for training; and (4) that he was not provided training under circumstances giving rise to an inference of discrimination, i.e., that he was denied training given to other similarly situated employees who were not members of the protected group. *See Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).

18

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 248, 252-54 (1973). If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies this burden of production, the plaintiff must put forth evidence that defendant's articulated reason was a pretext for discrimination. *Id.* at 802.

DaCosta, who is of Indian heritage, is a member of a protected group. (Doc. 64 at 4.) He alleges that he suffered an adverse employment action when he was denied training for Linux, Certified Internet Webmaster, and Microsoft Certification, and was not allowed to take the certification test for A+.[12] (Doc. 59 at 23.) For the reasons set forth above in the "Retaliation" section of this opinion, DaCosta's inability to obtain training did not constitute an adverse employment action.

However, even assuming that DaCosta established a prima facie case, the Board has articulated several non-discriminatory reasons for DaCosta's inability to obtain training. For example, the Board notes that plaintiff has attended several classes, the Board encouraged him to take more classes in his evaluation, the direction of technology

---

[12]Although DaCosta's brief alleges only failure to train as an adverse employment action with respect to his discrimination claim, the court notes that DaCosta probably suffered an adverse employment action when the Board reduced his overtime hours. However, there is no evidence that DaCosta and any similarly-situated employee received dissimilar treatment with regard to overtime hours. Therefore, DaCosta is unable to establish a prima facie case.

19

is unpredictable, and other employees took classes on their own initiative. (Doc. 65 at 21-23.) As the court has noted, DaCosta's evidence of name-calling and McPherson's affidavit fail to establish that the Board's articulated reasons are a pretext for unlawful discrimination. Therefore, even if DaCosta established a prima facie case of discrimination, summary judgment is still be due to be granted.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 12th day of March, 2007.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE